**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

CAUSE OF ACTION INSTITUTE,

           Plaintiff,

      v.

U.S. DEPARTMENT OF JUSTICE,

           Defendant.

_____

Civil Action No. 17-01423 (JEB)

**MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

# <u>TABLE OF CONTENTS</u>

Table of Authorities ................................................................................................................... ii

Introduction ................................................................................................................................ 1

Background ................................................................................................................................. 2

Procedural History ..................................................................................................................... 4

Standard of Review .................................................................................................................... 5

Argument ................................................................................................................................... 7

I.    Defendant has improperly invoked Exemption 5 to withhold the records at issue. ........... 7

    A.    Defendant cannot use the attorney-client privilege to withhold responsive records in this case. .................................................................................................... 8

        1.    The White House-DOJ Communication is not protected by the attorney-client privilege because there is no attorney-client relationship between the Office of the White House Counsel and the Office of Information Policy; moreover, the Office of the White House Counsel neither shared any private confidences nor solicited legal advice. ........................................................... 8

        2.    The Agency-DOJ Communications are not protected by the attorney-client privilege because the "unidentified Executive Branch agency" shared those communications with the Office of Legislative Affairs. ................................. 11

    B.    Defendant cannot use the deliberative process privilege to withhold responsive records in this case. ................................................................................................... 13

        1.    The White House-DOJ Communication is neither predecisional nor deliberative because it does not reflect a consultative process and includes a publicly available, non-deliberative record. .................................................. 14

        2.    The Agency-DOJ Communications, in their entirety, are neither predecisional nor deliberative. ........................................................................ 16

    C.    Defendant has not met its burden under the "foreseeable harm" standard. ............. 18

II.    Defendant failed to release all reasonably segregable portions of responsive records. ..... 19

III.    In camera review of the records at issue would be appropriate. ..................................... 22

Conclusion ................................................................................................................................ 23

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Access Reports v. Department of Justice,*
    926 F.2d 1192 (D.C. Cir. 1991) .......................................................................13, 15

*Afshar v. Department of State,*
    702 F.2d 1125 (D.C. Cir. 1983) ................................................................................20

*American Civil Liberties Union v. Department of Justice,*
    655 F.3d 1 (D.C. Cir. 2011) .......................................................................................6

*Ancient Coin Collectors Guild v. Department of State,*
    641 F.3d 504 (D.C. Cir. 2011) ...........................................................................13, 18

*Brinton v. Department of State,*
    636 F.2d 600 (D.C. Cir. 1980) ...................................................................................9

*Carter v. Department of Commerce,*
    830 F.2d 388 (D.C. Cir. 1987) .................................................................................23

*Chesapeake Bay Foundation, Inc. v. U.S. Army Corps of Engineers,*
    722 F. Supp. 2d 66 (D.D.C. 2010) ......................................................................17, 20

*Coastal States Gas Corp. v. Department of Energy,*
    617 F.2d 854 (D.C. Cir. 1980) ......................................................................... *passim*

*Cottone v. Reno,*
    193 F.3d 550 (D.C. Cir. 1999) ...........................................................................10, 20

*Defenders of Wildlife v. U.S. Border Patrol,*
    623 F. Supp. 2d 83 (D.D.C. 2009) .............................................................................6

*Department of the Interior v. Klamath Water Users Protective Ass'n,*
    532 U.S. 1 (2001) ................................................................................................7, 18

*Department of Justice v. Tax Analysts,*
    492 U.S. 136 (1989) ...................................................................................................6

*Ecological Rights Foundation v. Federal Emergency Management Agency,*
    No. 16-5254, 2017 WL 5972702 (N.D. Cal. Nov. 30, 2017) ....................................19

*Edmonds Institute v. Department of the Interior,*
    383 F. Supp. 2d 105 (D.D.C. 2005) ..........................................................................20

*Electronic Frontier Foundation v. Department of Justice,*
   826 F. Supp. 2d 157 (D.D.C. 2011) ...................................................6, 10

*John Doe Agency v. John Doe Corp.,*
   493 U.S. 146 (1989) .........................................................................6

*Jordan v. Department of Justice,*
   591 F.2d 753 (D.C. Cir. 1978) .............................................................14

*Judicial Watch, Inc. v. Consumer Financial Protection Bureau,*
   985 F. Supp. 2d 1 (D.D.C. 2014) ..........................................................6

*Judicial Watch, Inc. v. Department of State,*
   241 F. Supp. 3d 174 (D.D.C. 2017) .......................................................15

*Judicial Watch, Inc. v. Department of the Treasury,*
   796 F. Supp. 2d 13 (D.D.C. 2011) ........................................................21

*Judicial Watch, Inc. v. U.S. Postal Service,*
   297 F. Supp. 2d 252 (D.D.C. 2004) ..............................................9, 10, 14

*Senate of P.R. ex rel. Judiciary Committee v. Department of Justice,*
   823 F.2d 574 (D.C. Cir. 1987) .............................................................14

*King v. Department of Justice,*
   830 F.2d 210 (D.C. Cir. 1987) .............................................................6

*Krikorian v. Department of State,*
   984 F.2d 461 (D.C. Cir. 1993) ............................................................20

*In re Lindsey,*
   148 F.3d 1100 (D.C. Cir. 1998) ...........................................................8

*In re Lindsey,*
   158 F.3d 1263 (D.C. Cir. 1998) ...........................................................9

*Loving v. Department of Defense,*
   550 F.3d 32 (D.C. Cir. 2008) .............................................................22

*Mead Data Center, Inc. v. Department of the Air Force,*
   566 F.2d 242 (D.C. Cir. 1977) ...................................................6, 8, 10, 11

*Morley v. Central Intelligence Agency,*
   508 F.3d 1108 (D.C. Cir. 2007) ..........................................................18

*National Archives & Records Administration v. Favish,*
   541 U.S. 157 (2004) .......................................................................5

*National Labor Relations Board v. Robbins Tire & Rubber Co.*,
  437 U.S. 214 (1978)..................................................................................................5

*National Labor Relations Board v. Sears, Roebuck & Co.*,
  421 U.S. 132 (1975)..................................................................................................7

*National Security Archive v. Central Intelligence Agency*,
  402 F. Supp. 2d 211 (D.D.C. 2005)........................................................................21

*People for the American Way Foundation v. National Park Service*,
  503 F. Supp. 2d 284 (D.D.C. 2007)..................................................................14, 23

*Petroleum Information Corp. v. Department of the Interior*,
  976 F.2d 1429 (D.C. Cir. 1992)..............................................................................14

*Public Citizen, Inc. v. Office of Management & Budget*,
  598 F.3d 865 (D.C. Cir. 2010).................................................................................13

*Pully v. Internal Revenue Service*,
  939 F. Supp. 429 (E.D. Va. 1996) ..........................................................................12

*Quick v. Department of Commerce*,
  775 F. Supp. 2d 174 (D.D.C. 2011) ..........................................................................5

*Quiñon v. Federal Bureau of Investigation*,
  86 F.3d 1222 (D.C. Cir. 1996).........................................................................22, 23

*In re Sealed Case*,
  676 F.2d 793 (D.C. Cir. 1982).................................................................................11

*In re Sealed Case*,
  737 F.2d 94 (D.C. Cir. 1984).....................................................................................8

*Spirko v. U.S. Postal Service*,
  147 F.3d 992 (D.C. Cir. 1998).................................................................................22

*Tax Analysts v. Internal Revenue Service*,
  117 F.3d 607 (D.C. Cir. 1997)......................................................................8, 10, 13

*Trans-Pacific Policing Agreement v. U.S. Customs Service*,
  177 F.3d 1022 (D.C. Cir. 1999)..............................................................................19

*United States v. Weber Aircraft Corp.*,
  465 U.S. 792 (1984)...................................................................................................7

*Vaughn v. Rosen*,
  523 F.2d 1136 (D.C. Cir. 1975).........................................................................13, 14

**Statutes**

5 U.S.C. § 552(a)(4)(B) .................................................................................................6, 22

5 U.S.C. § 552(a)(8)(A)(i)(I) .........................................................................................18, 19

5 U.S.C. § 552(b) ................................................................................................................19

5 U.S.C. § 552(b)(5) .............................................................................................................7

**Rules**

Fed. R. Civ. P. 56(a) .............................................................................................................6

**Other Authorities**

162 Cong. Rec. S1496 (daily ed. Mar. 15, 2016) (statement of Sen. Leahy) ................18

*About the Office*, Dep't of Justice Office of Legislative Affairs,
  http://bit.ly/2w5RAjZ.................................................................................................11

*Cause of Action Institute Signs Second Coalition Letter Warning of Continued
  Congressional Interference with the FOIA*, Sept. 28, 2017,
  http://coainst.org/2iofBbL..........................................................................................4

*Cause of Action Signs Coalition Letter Opposing Congressional Interference with
  the FOIA*, May 10, 2017, http://coainst.org/2qVs7qc.................................................4

Dep't of Justice, Attorney General Memorandum for Executive Departments and
  Agencies Concerning the Freedom of Information Act, 74 Fed. Reg. 51,879
  (Oct. 8, 2009) ...............................................................................................................19

Geoff Koss, *Effort to shield documents sparks transparency debate*, E&E News,
  May 10, 2017, http://bit.ly/2FuMVr7 ..........................................................................3

*GOP lawmaker challenged for shielding records: 'What is he trying to die?'*, The
  Guardian, May 6, 2017, http://bit.ly/2pOK3lU............................................................3

Max Greenwood, *GOP chairman tells agencies to exclude info from FOIA
  requests*, The Hill, May 5, 2017, http://bit.ly/2FvuO4D ...........................................3

Michelle Cottle, The Atlantic, July 23, 2017, https://theatln.tc/2HLJkqz ......................4

Ryan P. Mulvey, *The next front in the FOIA War: Congress blocking disclosure
  of its dealings with the Executive Branch*, The Hill, May 8, 2017, http://bit.ly/2tlyBsF .......................4

## **INTRODUCTION**

This case concerns a Freedom of Information Act ("FOIA") request that seeks access to records of communications between Defendant Department of Justice's ("DOJ") Office of Information Policy ("OIP") or Office of Legislative Affairs ("OLA"), and twelve different Executive Branch agencies, the White House, and certain members of Congress and their staffs. Those communications, in turn, concern an unprecedented directive from Representative Jeb Hensarling, Chairman of the United States House of Representatives Committee on Financial Services, to the twelve agencies under his jurisdiction to treat all records of their dealings with the Committee as not subject to the FOIA. Chairman Hensarling's directive is a troubling instance of Congress attempting to limit the reach of the FOIA and block disclosure of vital information. The proper definition of an "agency record," as opposed to a "congressional record," is a pressing topic for the transparency community. The records at issue would shed light on the implications of Chairman Hensarling's directive and how the Executive Branch has sought to respond to it.

Defendant argues that the records at issue are exempt from disclosure under FOIA Exemption 5, in conjunction with the attorney-client and deliberative process privileges. Yet Defendant's arguments are unavailing. As Plaintiff Cause of Action Institute ("CoA Institute") sets forth below, the attorney-client privilege does not apply to the communications with the White House at issue here, which, on their face, are factual and informative rather than a solicitation of legal advice. Defendant's communications with an unidentified Executive Branch agency also are non-exempt because that agency waived the attorney-client privilege. Finally, Defendant cannot rely on the deliberative process privilege because the records at issue are either already publicly available, purely factual, do not reveal the consultative process, or would not otherwise chill

agency decision-making processes, if disclosed.  At the least, Defendant has failed to undertake reasonable efforts to segregate non-exempt material for release.

CoA Institute therefore respectfully requests that the Court deny Defendant's motion for summary judgment and grant CoA Institute's cross-motion for summary judgment.

## BACKGROUND

Between late March and early April 2017, Representative Jeb Hensarling, Chairman of the United States House of Representatives Committee on Financial Services (the "Committee"), sent twelve (12) nearly identical letters to the federal agencies under the Committee's jurisdiction.  Pl.'s Statement of Undisputed Material Facts ¶ 1 [hereinafter Pl.'s SUMF]; Decl. of Ryan P. Mulvey ¶ 4, Exs. 1–12.[1]  These letters (the "Hensarling Directive") directed the agencies to "treat all records exchanged with the Committee as 'congressional records' not subject to the FOIA."  Pl.'s SUMF ¶ 2; Mulvey Decl. ¶ 5.  The Hensarling Directive also set forth the Committee's view that all records classified as "congressional" in nature should be "subject to the absolute protections of the Speech or Debate Clause of the Constitution[.]"  Mulvey Decl. ¶ 6.

Soon after receiving the Hensarling Directive, the twelve agencies under the Committee's jurisdiction began to proffer their responses to the Committee.  Among other things, these responses were intended to confirm whether each agency would abide by Chairman Hensarling's instructions and ensure the implementation of agency-specific policies and procedures for handling any "congressional records."  *See* Pl.'s SUMF ¶¶ 3–4.  At least five of these response letters are

---

[1] The twelve agencies that received the Hensarling Directive include: the Department of the Treasury, the Department of Housing and Urban Development, the Board of Governors of the Federal Reserve, the Securities and Exchange Commission, the Consumer Financial Protection Bureau, the National Credit Union Administration, the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the Export-Import Bank of the United States, the Federal Emergency Management Agency, the Financial Stability Oversight Council, and the Federal Housing Finance Agency.  *See* Mulvey Decl. ¶ 4(a)–(l), Exs. 1–12.

publicly available, *see id.* ¶ 5(a)–(e); Mulvey Decl. Exs. 13–17, and they reveal varying degrees of commitment to follow the precise terms of the Hensarling Directive.  The National Credit Union Administration, for example, agreed to "treat any covered records in accordance with the procedures" that Chairman Hensarling requested.  *See* Pl.'s SUMF ¶ 5(a).  But other agencies were less willing to countenance the Committee's position.  *Compare id.* ¶ 5(b) (Consumer Financial Protection Bureau agreed with the Hensarling Directive "to the extent consistent with law," while its staff continued their "review and related consultation"), *with id.* ¶ 5(d) (Department of Housing and Urban Development delayed any commitment until it completed "interagency coordination").

While the twelve agencies were providing their responses to the Committee, the Hensarling Directive become a matter of public knowledge.  On May 4 and May 8, 2017, BuzzFeed published two critical reports.  *See* Compl. ¶ 3 (citing Mary Ann Georgantopoulos, *These Federal Agencies Agreed To Conceal Some of Their Communications From the Public*, BuzzFeed News, May 8, 2017, http://bzfd.it/2rihpcY, and Mary Ann Georgantopoulos & Daniel Wagner, *A House Committee Doesn't Want You To See Its Correspondence With Government Officials*, BuzzFeed News, May 4, 2017, http://bzfd.it/2ruLXFO).  Other media outlets followed suit.  *See GOP lawmaker challenged for shielding records: 'What is he trying to hide?'*, The Guardian, May 6, 2017, http://bit.ly/2pOK3lU; Max Greenwood, *GOP chairman tells agencies to exclude info from FOIA requests*, The Hill, May 5, 2017, http://bit.ly/2FvuO4D.

The Hensarling Directive also has played a significant role in a broader debate about efforts within the federal government to limit public access to politically sensitive records, whether those records reflect purely internal Executive Branch dealings or the interaction of the administrative state with Congress.  *See, e.g.*, Geoff Koss, *Effort to shield documents sparks transparency debate*, E&E News, May 10, 2017, http://bit.ly/2FuMVr7; Ryan P. Mulvey, *The next front in the FOIA*

*War: Congress blocking disclosure of its dealings with the Executive Branch*, The Hill, May 8, 2017, http://bit.ly/2tIyBsF; *see also* Michelle Cottle, *The War on the Freedom of Information Act*, The Atl., July 23, 2017, https://theatln.tc/2HLJkqz.   Because of the Hensarling Directive, numerous government transparency advocates, including CoA Institute, have twice petitioned legislators to discontinue their efforts to expand the definition of "congressional records" not subject to disclosure under the FOIA.  *See* CoA Institute, *Cause of Action Institute Signs Second Coalition Letter Warning of Continued Congressional Interference with the FOIA*, Sept. 28, 2017, http://coainst.org/2iofBbL; CoA Institute, *Cause of Action Signs Coalition Letter Opposing Congressional Interference with the FOIA*, May 10, 2017, http://coainst.org/2qVs7qc.

## PROCEDURAL HISTORY

By letter, dated May 18, 2017, CoA Institute submitted a FOIA request to Defendant seeking access to records from OIP and OLA concerning the Hensarling Directive.  Pl.'s SUMF ¶ 6.  Specifically, CoA Institute requested all communications between or among OIP or OLA and either (1) the twelve agencies that received the Hensarling Directive, or (2) various representatives of the White House and Congress concerning the treatment under the FOIA of records exchanged between Executive Branch agencies and Congress.  *Id.*  ¶¶ 7, 9; Compl. Ex. 1, ECF No. 1-1.

Defendant received CoA Institute's FOIA request on May 24, 2017 and issued its acknowledgement letter on June 22, 2017.  Pl.'s SUMF ¶ 11.  Defendant cited "unusual circumstances" and extended the time limit for its response beyond the ten additional working days provided by the statute.  *Id.* ¶ 12.  On July 18, 2017, CoA Institute filed this lawsuit.  *Id.* ¶ 14.

Defendant conducted a search for responsive records and provided its "final response" to CoA Institute's FOIA request by letter, dated November 14, 2017.  *Id.* ¶ 16.  Defendant released five (5) pages of responsive records, which were partially redacted under FOIA Exemption 5, in conjunction with the attorney-client and deliberative process privileges, and FOIA Exemption 6.

*Id.* ¶ 18.  On January 8, 2018, Defendant issued a second "final response" after it realized it had "inadvertently overlooked" some "additional records that appeared to be responsive."  *Id.* ¶ 19. These newly identified records, totaling eleven (11) pages, were withheld in full under FOIA Exemption 5, in conjunction with the attorney-client and deliberative process privileges.  *Id.* ¶ 20.

CoA Institute does not challenge the adequacy of Defendant's search for responsive records, *id.* ¶ 21, nor does it challenge the use of FOIA Exemption 6 to withhold portions of the records released on November 14, 2017.  *Id.* ¶ 22.  The only issue before the Court—and the subject of the instant cross-motions for summary judgment—is Defendant's use of FOIA Exemption 5, in conjunction with the attorney-client and deliberative process privileges, to withhold (1) the second line of an email from the Office of the White House Counsel ("OWHC") to the Director of OIP, (2) a two-page attachment to the same OWHC email, and (3) all eleven (11) pages withheld in full in Defendant's January 8, 2018 response.  *Id.* ¶ 23.

## STANDARD OF REVIEW

"Congress enacted the FOIA to introduce transparency into government activities."  *Quick v. Dep't of Commerce*, 775 F. Supp. 2d 174, 179 (D.D.C. 2011) (citing *Stern v. Fed. Bureau of Investigation*, 737 F.2d 84, 88 (D.C. Cir. 1984)).  The statute serves as a "means for citizens to know 'what the Government is up to'" and it "defines a structural necessity in a real democracy." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171–72 (2004) (citation omitted); *see also Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978) ("The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed.").  The rights afforded under the FOIA are a bulwark to the "fundamental principle of public access" to records of the administrative state, which can often be "'shielded unnecessarily

from public view . . . [by] possibly unwilling official hands.'" *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151 (1989) (quoting *Envtl. Prot. Agency v. Mink*, 410 U.S. 73, 80 (1973)).

FOIA cases are typically decided by summary judgment motions.  *See Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009).  Yet summary judgment should only be granted when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When determining whether a genuine issue of material fact exists, "all underlying facts and inferences are analyzed in the light most favorable to the FOIA requester; as such, only after an agency proves that it has fully discharged its FOIA obligations is summary judgment appropriate."  *Judicial Watch, Inc. v. Consumer Fin. Prot. Bureau*, 985 F. Supp. 2d 1, 1 (D.D.C. 2014), *vacated on other grounds*, 60 F. Supp. 3d 1 (D.C. Cir. 2014) (citing *Moore v. Aspin*, 916 F. Supp. 32, 35 (D.D.C. 1996)).

With respect to the use of statutory exemptions, agency determinations are reviewed *de novo*.  5 U.S.C. § 552(a)(4)(B).  "Consistent with congressional intent tilting the scales in favor of full disclosure," *Elec. Frontier Found. v. Dep't of Justice*, 826 F. Supp. 2d 157, 164 (D.D.C. 2011), an agency bears the substantial burden of demonstrating whether the withheld records, or portions thereof, are properly exempt.  *See Am. Civil Liberties Union v. Dep't of Justice*, 655 F.3d 1, 5 (D.C. Cir. 2011); *see also Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989).  Exemptions must be "narrowly construed" and "conclusory and generalized allegations . . . are unacceptable."  *Elec. Frontier Found.*, 826 F. Supp. 2d at 164; *see Mead Data Ctr., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977) ("[A]n agency [that] seeks to withhold information . . . must provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." (citations omitted)); *see also King v. Dep't of Justice*,

6

830 F.2d 210, 219 (D.C. Cir. 1987) ("To accept an inadequately supported exemption claim 'would constitute an abandonment of the trial court's obligation under the FOIA to conduct a *de novo* review.'" (citation and footnote omitted)).

## ARGUMENT

I.    **Defendant has improperly invoked Exemption 5 to withhold the records at issue.**

FOIA Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).[2] The Supreme Court has construed Exemption 5 to protect from disclosure "those documents, *and only those documents* that are normally privileged in the civil discovery context." *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975) (emphasis added and footnote omitted); *see also Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). Although Exemption 5 encompasses various statutory and common law privileges, *see United States v. Weber Aircraft Corp.*, 465 U.S. 792, 800–01 (1984), two of the most commonly invoked privileges—which are relevant here—are the deliberative process and attorney-client privileges. *See Sears, Roebuck & Co.*, 421 U.S. at 149–50.

In this case, Defendant asserts that the deliberative process and attorney-client privileges shield the responsive records from disclosure, either in part or in full. *See* Def.'s Mem. of P. & A. in Supp. of Def.'s Mot. for Summ. J. at 9–17 [hereinafter Def.'s Mem.], ECF No. 14.[3] But Defendant fails to justify with adequate specificity its reliance on those privileges. The Court

---

[2] The threshold consideration for Exemption 5 is whether a record constitutes an "inter-agency or intra-agency memorandum[] or letter[]." 5 U.S.C. § 552(b)(5). CoA Institute does not dispute whether the withheld records, or portions thereof, qualify as "inter-agency or intra-agency memorandums or letters," as that phrase has been interpreted by the judiciary.

[3] CoA Institute adopts Defendant's labels of "White House-DOJ Communication" and "Agency-DOJ Communications" to refer to the records at issue from Defendant's November 14, 2017 and January 8, 2018 FOIA productions, respectively. *See* Def.'s Mem. at 5.

should reject Defendant's use of Exemption 5.  In the alternative, the Court should conduct an *in camera* inspection to ensure the proper application of Exemption 5 and guarantee that there are no reasonably segregable non-exempt portions of the records at issue.  *See infra* pp. 19–23.

**A.    Defendant cannot use the attorney-client privilege to withhold responsive records in this case.**

The attorney-client privilege covers "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice." *Mead Data Ctr., Inc.*, 566 F.2d at 252 (footnote omitted).  The privilege is "not limited to communications made in the context of litigation or even a specific dispute," but it must nevertheless reflect a client's request for his "attorney's counsel . . . on a legal matter." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980).  Indeed, the privilege "must be 'strictly confined within the narrowest possible limits consistent with the logic of its principle[.]'" *In re Lindsey*, 148 F.3d 1100, 1108 (D.C. Cir. 1998) (citation omitted).  Here, none of the records withheld in full or in part are properly covered by the attorney-client privilege.

**1.    The White House-DOJ Communication is not protected by the attorney-client privilege because there is no attorney-client relationship between the Office of the White House Counsel and the Office of Information Policy; moreover, the Office of the White House Counsel neither shared any private confidences nor solicited legal advice.**

The attorney client privilege only protects confidential communications made by a client to an attorney "'for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding,'" and when the privilege has not been "'waived by the client.'" *In re Sealed Case*, 737 F.2d 94, 98–99 (D.C. Cir. 1984) (citation omitted).  In the governmental context, an agency is typically the "client" and its departmental counsel is the "attorney." *See Tax Analysts v. Internal Revenue Serv.*, 117 F.3d 607, 618 (D.C. Cir. 1997).  The privilege properly applies to communications created in the context of an *actual*

attorney-client relationship and not simply whenever an agency communicates with another entity composed of lawyers. *See Brinton v. Dep't of State*, 636 F.2d 600, 603 (D.C. Cir. 1980) ("[T]he attorney-client privilege applies only when information is the product of an attorney-client relationship and is maintained as confidential between attorney and client.").

Here, the privilege cannot extend to the White House-DOJ Communication, which consists of a short email from the OWHC to the Director of OIP and an attached copy of the Hensarling Directive, because OIP does not provide "legal services" to the White House or the OWHC,[4] and Defendant has failed to establish the existence of any actual attorney-client relationship between the White House/OWHC and OIP in this particular instance. Indeed, even if such a relationship could, in theory, exist, Defendant's use of the privilege in this case must be rejected for at least two reasons.

*First*, Defendant has failed to explain how the OWHC shared any "private information concerning the ['client']" (whether the client is considered the OWHC or the White House) with OIP. *Coastal States Gas Corp.*, 617 F.2d at 863; *see also Judicial Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252, 267 (D.D.C. 2004) (An "agency must show that it supplied information to its lawyers 'with the expectation of secrecy[.]'" (citing *Mead Data Ctr., Inc.*, 566 F.2d at 253)). For example, the Hensarling Directive, which was attached to the cover email of the White House-DOJ Communication, *see* Pl.'s SUMF ¶ 24, but withheld in full, *see id.* ¶ 23, is not a confidential document, did not originate with the White House, was not addressed to the White House, and does not concern the White House, except in the most attenuated sense. Moreover, the existence

---

[4] Similarly, the OWHC does not provide legal services to Defendant (or to other federal agencies), but offers legal assistance to the President and the White House staff in their official capacities. *In re Lindsey*, 158 F.3d 1263, 1268 n.1 (D.C. Cir. 1998) (OWHC "provides confidential counsel to the President in his official capacity, to the White House as an institution, and to senior advisors about legal matters that affect the White House's interests").

of the Hensarling Directive and the subject-matter of its contents were and are known by persons and entities outside the White House.  *See Judicial Watch, Inc.*, 297 F. Supp. 2d at 267 (An "agency must show . . . [the information at issue] 'was not *known by or disclosed to any third party*.'" (citation omitted and emphasis added)); *see also Tax Analysts*, 117 F.3d at 619–20 ("'The [third-party communications] do not contain any confidential information *concerning the Agency* . . . [and thus] do not fall within the scope of the attorney-client privilege[.]'" (citing *Schlefer v. United States*, 702 F.3d 233, 245 (D.C. Cir. 1983)); *see generally Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999) ("[M]aterials normally immunized from disclosure under FOIA lost their protective cloak once disclosed and preserved in a permanent public record.").

*Second*, Defendant has failed to explain with the required specificity how the White House-DOJ Communication involved the solicitation of legal advice.  *See Elec. Frontier Found.*, 826 F. Supp. 2d at 164; *Mead Data Ctr., Inc.*, 566 F.2d at 251.  Although Defendant's declarant mentions OIP's "legal expertise," *see* Decl. of Vanessa R. Brinkmann Decl. ¶ 18, ECF No. 14-1, and claims that the White House contacted the Director for "the specific purpose of receiving" such "expert legal advice," *id.* ¶ 21; *see also id.* ¶ 15 (the Director was "asked to provide her advice."), the content of White House-DOJ Communication belies those representations.  The entirety of the cover email from Associate White House Counsel Daniel Epstein to Melanie A. Pustay of OIP states in full: "FYI – the administration has received several letters like the attached" followed by a single redacted sentence.  Brinkmann Decl. Ex. C (Document No. 20170921 – 0000034).  Although redacted in full, the email attachment is one of the twelve letters sent out by Chairman Hensarling.  The email language thus suggests that the White House was simply alerting OIP to the existence of the Hensarling Directive and its distribution among Executive Branch entities.  Indeed, a typical request for legal advice certainly does not begin: "For Your Information."

### 2. The Agency-DOJ Communications are not protected by the attorney-client privilege because the "unidentified Executive Branch agency" shared those communications with the Office of Legislative Affairs.

To support its application of the attorney-client privilege, an agency bears the burden of demonstrating "that the information [at issue] is confidential" and "has [not] been . . . shared with third parties[.]"  *Mead Data Ctr.*, 566 F.2d at 253; *see also In re Sealed Case*, 676 F.2d 793, 809 (D.C. Cir. 1982) ("[A]ny voluntary disclosure by the client to a third party breaches the confidentiality of the attorney-client relationship and therefore waives the privilege, not only as to the specific communication but often as to all other communications relating to the same subject matter." (footnote omitted)).  When the "client" is an entity such as an Executive Branch agency, the confidential communications must be "circulated no further than among those members 'of the organization who are authorized to speak or act for the organization in relation to the subject matter of the communication.'"  *Coastal States Gas Corp.*, 617 F.2d at 863 (quoting *Mead Data Ctr.*, 566 F.2d at 253 n.24).

Here, the Agency-DOJ Communications contain information shared by an unidentified Executive Branch agency with the DOJ's Office of Legal Counsel ("OLC").  OLC is tasked with "provid[ing] advice and prepar[ing] [legal] opinions . . . involving operations of the Executive Branch."  Brinkmann Decl. ¶ 15; *id.* ¶ 14 n.3; *see also* Def.'s Mem. at 14.  But OLC was not the only component that had access to the alleged "confidential" materials provided by the unidentified agency; OLA also was included in those communications.  *See* Brinkmann Decl. ¶ 12.  And OLA has no role in the provision of legal services, either within the DOJ or the rest of the Executive Branch.  *See About the Office*, Dep't of Justice Office of Legislative Affairs, http://bit.ly/2w5RAjZ (last visited May 4, 2018).

Although Defendant's declarant notes that "OLA's involvement in these communications is . . . key, given that Office's expertise on matters involving the Legislative Branch," such

expertise cannot undo a client agency's voluntary disclosure of confidential information to a non-attorney third party.  This point is not a formalistic or technical one.  The D.C. Circuit, in *Coastal Gas Corp. v. Department of Energy*, explicitly rejected an agency's use of the attorney-client privilege when the document at issue was accessed by multiple agency components.  617 F.2d at 863.  The Circuit was unpersuaded by the government's argument that "circulation limited to the confines of the agency of a document otherwise entitled to protection under the attorney-client privilege should not defeat the privilege[.]"  *Id.*  This "would be far too broad a grant of privilege." *Id.*  Striking a balance that acknowledged limited circulation could be permissible, the Circuit stated that "[t]he test . . . is whether the agency is able to demonstrate that the documents . . . were circulated no further than among those members 'of the [agency] who are authorized to speak or act for the [agency] in relation to the subject matter of the communication.'"  *Id.* (citing *Mead Data Ctr.*, 566 F.2d at 256 n.24).[5]

Defendant's consideration of the Hensarling Directive, insofar as it may have required subject-matter expertise outside of OLC, did not implicate OLA as much as it did OIP.  The

_____

[5] Even when an agency provides a categorical description of records withheld under the attorney-client privilege, rather than a record-by-record index, it must still provide sufficient detail to establish *who* was involved with creation of the records.  *See, e.g.*, *Pully v. Internal Revenue Serv.*, 939 F. Supp. 429, 434 (E.D. Va. 1996).  The requirement for an agency to identify the persons involved with privileged communications, or at least to specify the offices they occupy, comports with the agency's burden in invoking the privilege.  *Id.* ("The burden lies with the party invoking the privilege to demonstrate that the attorney-client relationship existed, that the communication is privileged, and that the party did not waive the privilege.").  In this case, Defendant offers too generalized a description of the persons who were involved in the supposed attorney-client communications at issue.  *See* Brinkmann Decl. ¶ 23 ("In these exchanges between senior DOJ attorneys and officials at Executive Branch entities, DOJ clients share information . . . in confidence, for the purpose of soliciting its legal advice.").  Defendant must provide more information to sustain the privilege, including enough detail to establish that records were "circulated no further than among those . . . '[who were] authorized to speak or act for the [DOJ and its agency client] in relation to the subject matter of the [Hensarling Directive].'"  *Coastal States Gas Corp.*, 617 F.2d at 863 (quoting *Mead Data Ctr.*, 566 F.2d at 253 n.24).

Hensarling Directive relates neither to congressional oversight inquiries nor individual Members'
legislative efforts; it is an order to treat certain records, otherwise presumptively disclosable, as
beyond the reach of the FOIA. *See* Brinkmann Decl. ¶ 13 ("The records protected by OIP . . .
[include] correspondence regarding the treatment under the FOIA of records exchanged between
Executive Branch and Congress."). Defendant offers no satisfactory explanation for why OLA
would have been involved in providing "legal advice" on a FOIA matter. Defendant has thus
failed to "carry its burden in establishing that these [Agency-DOJ Communications] should be
granted protection under the attorney-client privilege." *Coastal States Gas Corp.*, 617 F.2d at 864.

**B.    Defendant cannot use the deliberative process privilege to withhold responsive
records in this case.**

The records at issue also are not protected by "[t]he deliberative process privilege," which
"shields only government 'materials which are both predecisional and deliberative.'" *Tax
Analysts*, 117 F.3d at 616 (citing *Wolfe v. Dep't of Health & Human Servs.*, 839 F.2d 768, 774
(D.C. Cir. 1988)); *see also Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1194 (D.C. Cir.
1991). A record is "predecisional" when it is generated "'[a]ntecedent to the adoption of an agency
policy.'" *Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011)
(citation omitted). It is "deliberative" when it forms "a direct part of the deliberative process in
that it makes recommendations or expresses opinion on legal or policy matters," *Vaughn v. Rosen*,
523 F.2d 1136, 1144 (D.C. Cir. 1975), thereby reflecting the "give-and-take of the consultative
process" typical of agency decision-making. *Coastal States Gas Corp.*, 617 F.2d at 867; *see also
Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 875 (D.C. Cir. 2010) ("To the extent
the documents . . . neither make recommendations for policy change nor reflect internal
deliberations on the advisability of any particular course of action, they are not predecisional and
deliberative despite having been produced by an agency that generally has an advisory role").

13

"The key question" is "whether disclosure would tend to diminish candor within an agency." *People for the Am. Way Found. v. Nat'l Park Serv.*, 503 F. Supp. 2d 284, 298 (D.D.C. 2007).  In this case, Defendant's reliance on the deliberative process privilege fails.

>    1.    **The White House-DOJ Communication is neither predecisional nor deliberative because it does not reflect a consultative process and includes a publicly available, non-deliberative record.**

Defendant argues that the White House-DOJ Communication, which, as noted, consists of a short cover email from the OWHC to the Director of OIP and an attached copy of the Hensarling Directive, is (1) predecisional, because it "initate[d] a discussion on matters of Executive Branch decision, including responses to congressional inquiries," Def.'s Mem. at 9; and (2) deliberative, because "the email exchanged is part and parcel to the routine yet essential back-and-forth consultative process that make[s] up the core of the Executive Branch's decision-making process." *Id.* at 10.  Defendant cannot establish either point.

For a record to be "predecisional," an agency must demonstrate that it was "'prepared in order to assist an agency decision maker in arriving at [a] decision[.]'" *Petroleum Info. Corp. v. Dep't of the Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (citation omitted); *see also Jordan v. Dep't of Justice*, 591 F.2d 753, 774 (D.C. Cir. 1978) ("The privilege protects only communications . . . that are actually antecedent to the adoption of an agency policy.").  But Defendant has failed to describe the specific *agency* decision or *agency* decision-making process implicated by the OWHC email and attached copy of the Hensarling Directive.  On its face, the purpose of the email was simply to provide information, *i.e.*, to alert OIP to the existence of the Hensarling Directive.

When justifying the use of the deliberative process privilege, the need for specificity in an agency's supporting declaration or *Vaughn* index is particularly acute.  *See Judicial Watch, Inc.*, 297 F. Supp. 2d at 257; *see also Senate of P.R. ex rel. Judiciary Comm. v. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987) (rejecting an agency's use of the deliberative process privilege

14

when its justification "consist[ed] almost entirely of each document's issue date, its author and intended recipient, and the briefest of references to its subject matter").  Here, Defendant merely alludes to "matters of Executive Branch decision, including responses to congressional inquiries." Brinkmann Decl. ¶ 30.  This sort of vague statement does not establish the predecisional nature of the records at issue because it could describe most, if not all, records within the Executive Branch. In particular, Defendant does not describe any specific "ongoing deliberative process" that involves the formulation of government-wide policy on responding to congressional inquiries or demands such as the Hensarling Directive.  *See Access Reports*, 926 F.2d at 1195.

As for the "deliberative" aspect of the White House-DOJ Communication, Defendant's arguments are ineffective.  Defendant appeals to the subject-matter expertise of the OIP Director, Def.'s Mem. at 10, but that is without moment.  Although this "expertise" could be material if there were some indication that the Director was involved in the formulation of an actual policy, that is not the case here, as explained above.  Similarly, Defendant's description of the cover email from OWHC and its attachment as "initat[ing] a discussion," Def.'s Mem. at 9; Brinkmann Decl. ¶ 30, is not supported by the unredacted portions of the record itself, which show that the OWHC was simply alerting OIP to the existence of the Hensarling Directive.  *See* Brinkmann Decl. Ex. C (Document No. 20170921 - 0000034) ("FYI – the administration has received several letters like the attached.").  OIP Director Melanie Pustay then forwarded the cover email and its attachment with an equally straightforward and simple message: "FYI."  *Id.*

Thus, the email chain at issue does not suggest the initiation of any kind of deliberative decision-making process, but rather constitutes informational notice.  This type of factual communication is not covered by the deliberative process privilege.  *Judicial Watch, Inc. v. Dep't of State*, 241 F. Supp. 3d 174, 185 (D.D.C. 2017) ("The records do not emphasize, comment upon,

or characterize events or facts; they simply . . . pass information . . . without any indication that the information should prompt further action or bear upon a decision[.]").

Defendant's arguments with respect to the attached Hensarling Directive also are without merit. Defendant claims that the OWHC's "decision to raise a particular letter, and not others . . . is itself an important part of the deliberative process." Def.'s Mem. at 10. But that position is undermined by two particular facts that Defendant fails to address. *First*, even assuming Defendant properly could testify as to the motive of OWHC staff in choosing one copy of the Hensarling Directive over another, Defendant has failed to tie the White House's decision in that regard to *Defendant's* deliberative processes. *Second*, all twelve copies of the Hensarling Directive are publicly available. *See* Mulvey Decl. ¶ 4, Exs. 1–12. Other than the particular agency addressee, all twelve copies of the Hensarling Directive are identical. Defendant does not explain how the identity and address of the agency listed on the specific copy of the Hensarling Directive sent to OIP would reveal the "very details of Executive Branch decision-making" or otherwise chill internal deliberations, particularly in light of the public disclosure of all versions of the letter.[6]

### 2.   The Agency-DOJ Communications, in their entirety, are neither predecisional nor deliberative.

Finally, Defendant argues that the Agency-DOJ Communications, which were released in the second "final response" on January 8, 2018, Pl.'s SUMF ¶ 14, are exempt in full under the deliberative process privilege. *See* Def.'s Mem. at 11–14. Although some of these records may be deliberative, the Court must reject Defendant's wholesale redaction for the following three reasons. *See also infra* pp. 19–22 (discussing unreasonableness of Defendant's segregability review).

---

[6] Defendant also fails to address why its concerns would not be alleviated by withholding only the agency-identifying portions of the attachment, as opposed to withholding the record in full.

*First*, "the deliberative process privilege does not apply to *all* predecisional documents created during the deliberative process.  Rather, to be privileged, 'the statement or document must have been "a *direct part* of the deliberative process in that it *makes recommendations* or *expresses opinion* on legal or policy matters."'"  *Chesapeake Bay Found., Inc. v. U.S. Army Corps of Eng'rs*, 722 F. Supp. 2d 66, 75 (D.D.C. 2010) (citing *Cobell v. Norton*, 213 F.R.D. 1, 54 (D.D.C. 2003)) (emphasis added).  A mere "request for legal advice," Def.'s Mem. at 11, to the extent it is antecedent to an agency's decision to respond to the Hensarling Directive, still does not reflect anything deliberative because it neither "makes recommendations" nor "expresses opinion." *Chesapeake Bay Found. Inc.*, 722 F. Supp. 2d at 75.

The unredacted records from Defendant's November 14, 2017 production are instructive.  Those documents reveal that the Department of Housing and Urban Development contacted the Director of OIP to ask whether she "had heard or been consulted" about the Hensarling Directive, which "appear[ed] to contradict both the FOIA, and the Federal Records Act."  Brinkmann Decl. Ex. C (Document No. 20170921 – 0000003).  The agency wanted to know if "others have received the same instructions and how they plan to respond."  *Id.*  This communication—which was not withheld under Exemption 5—is an example of a record that is predecisional, but not deliberative.  Defendant offers no compelling distinction between this email and analogous emails in the Agency-DOJ Communications.

*Second*, with respect to the "agency draft," *see* Def.'s Mem. at 13; Brinkmann Decl. ¶ 29, any portion of such draft that is identical to the agency responses that are already publicly available, Pl.'s SUMF ¶ 5; Mulvey Decl. Exs. 13–17, is not covered by the deliberative process privilege and its disclosure would not tend to chill internal agency decision-making processes.

*Third*, Defendant concedes that the Agency-DOJ Communications include "an attachment containing the facts underlying [a] request for legal advice." Def.'s Mem. at 11. But Defendant does not explain how these "underlying facts" are deliberative. *See* Brinkmann Decl. ¶¶ 25–29. Purely "'[f]actual material that does not reveal the deliberative process is not protected[.]'" *Morley v. Cent. Intelligence Agency*, 508 F.3d 1108, 1127 (D.C. Cir. 2007) (citation omitted). The Hensarling Directive is already publicly available, and it does not differ in its instructions from agency to agency. Defendant makes no argument for why the factual "attachment," insofar as it is a selective summary of the issues raised by the Hensarling Directive, "reflects an 'exercise of discretion and judgment calls[.]'" *Ancient Coin Collectors Guild*, 641 F.3d at 513. And Defendant's description of the "attachment" does not state that it "makes recommendations" or "expresses opinion." The attachment is thus non-deliberative.

### C.    Defendant has not met its burden under the "foreseeable harm" standard.

The FOIA requires that an agency release records unless they fall under a specifically enumerated exemption. "[T]hese limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant object of the Act[.]" *Klamath Water Users Protective Ass'n*, 532 U.S. at 7–8 (internal citations omitted). With the passage of the FOIA Improvement Act of 2016, Congress made significant amendments to the FOIA, including changes that raise the standard by which an agency must evaluate its withholdings. Specifically, an agency may "withhold information" under the FOIA "only if [it] *reasonably foresees* that disclosure would harm an interest protected by an exemption[.]" 5 U.S.C. § 552(a)(8)(A)(i)(I) (emphasis added).

Under this "foreseeable harm" standard, it is not enough that Defendant make a case for the technical application of Exemption 5. Defendant must instead articulate *precise* reasons why *specific* records would harm *particular* aspects of the deliberative process or the interaction of an attorney (*e.g.*, OLC) with its client agency. *See* 162 Cong. Rec. S1496 (daily ed. Mar. 15, 2016)

18

(statement of Sen. Leahy) ("Importantly, codifying the presumption of openness will help reduce the perfunctory withholding of documents through the overuse of FOIA exemptions.  It requires agencies to consider whether the release of particular documents will cause any foreseeable harm to an interest the applicable exemption is meant to protect.").[7]

At least one court has recognized the impact of this new standard and the heavy burden it places on an agency to defend its use of exemptions.  In *Ecological Rights Foundation v. Federal Emergency Management Agency*, a district court ruled that an agency could not rely on the deliberative process privilege because it failed to "provide basic information about the deliberative process at issue and the role played by each *specific* document[.]"  No. 16-5254, 2017 WL 5972702, at *6 (N.D. Cal. Nov. 30, 2017), *appeal voluntarily dismissed*, No. 17-17539 (9th Cir. Jan. 12, 2018) (emphasis added).  Here, Defendant similarly has failed to explain why the specific records at issue could reasonably be foreseen to harm actual deliberative or attorney-client interests.  Defendant accordingly has not met its burden under 5 U.S.C. § 552(a)(8)(A)(i)(I).

## II.    Defendant failed to release all reasonably segregable portions of responsive records.

The failure to carefully review responsive records is contrary to the explicit mandate of the FOIA, which requires an agency to release "*any* reasonably segregable portion of a record . . . after deletion of the portions which are exempt."  5 U.S.C. § 552(b) (emphasis added).  An adequate segregability analysis is so vital to the FOIA's broad mandate of disclosure that every court has an affirmative duty to consider the issue *sua sponte*.  *See Trans-Pac. Policing Agreement v. U.S.*

---

[7] Agencies were previously afforded some discretion in implementing the so-called "presumption of openness."  *See* Dep't of Justice, Attorney General Memorandum for Executive Departments and Agencies Concerning the Freedom of Information Act, 74 Fed. Reg. 51,879 (Oct. 8, 2009) ("An agency should not withhold records merely because it can demonstrate, as a technical matter, that the records fall within the scope of a FOIA exemption.").  The FOIA Improvement Act of 2016 eliminated the discretionary nature of this "presumption" and replaced it with a mandatory "foreseeable harm" standard.

*Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999).  "A district court that 'simply approve[s] the withholding of an entire document without entering a finding on segregability, or lack thereof,' errs."  *Krikorian v. Dep't of State*, 984 F.2d 461, 467 (D.C. Cir. 1993) (citations omitted).

In this case, Defendant has failed to defend the reasonableness of its efforts to release segregable portions of responsive records.  Without an adequate showing, which "explain[s] in detail which portions of the document[s] are disclosable and which are allegedly exempt," Defendant has not carried its burden and is not entitled to summary judgment.  *Edmonds Inst. v. Dep't of the Interior*, 383 F. Supp. 2d 105, 108 (D.D.C. 2005).

With respect to the White House-DOJ Communication, if the Court were to accept Defendant's justifications for the attorney-client and deliberative process privileges, it should still require Defendant to release those portions of the records that have already been made publicly available, namely, the copy of the Hensarling Directive attached to the OWHC email.  *See supra* pp. 8–10; *see also Cottone*, 193 F.3d at 554.  CoA Institute has met its burden in "pointing to specific information in the public domain"— the Hensarling Directive, *see* Pl.'s SUMF ¶ 24— "that appears to duplicate that being withheld."  *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983); *see also Chesapeake Bay Found., Inc.*, 722 F. Supp. 2d at 72.

With respect to the Agency-DOJ Communications, the Court should require Defendant to re-process those records and release portions that are (1) purely factual, such as the "factual attachment," *see supra* p. 18; (2) non-deliberative, such as the initial request for DOJ's opinion, *see supra* p. 17; or (3) already in the public domain, such as any copy of the Hensarling Directive.  *See Afshar*, 702 F.2d 1125; *Cottone*, 193 F.3d at 554.  As already discussed, the "unnamed Executive Branch agency" also has waived the attorney-client privilege.  *See supra* pp. 11–13.  If the Court nevertheless finds that the privilege applies, Defendant's argument concerning

segregability must still fail. *See* Def.'s Mem. at 16. The identities of all twelve agencies that received the Hensarling Directive are known, *see* Pl.'s SUMF ¶ 1; Mulvey Decl. ¶ 4, Exs. 1–12, and the fact that one of those agencies sought OIP's advice is confirmed by the unredacted records included in Defendant's November 14, 2017 production. *See supra* p. 17. This undercuts Defendant's claim that "disclosure of the identity of the requesting agency, along with the general subject matter of the request, could inhibit the agency from seeking legal advice from OLC in the future." Def.'s Mem. at 16.

One final note bears mentioning. Defendant claims that it "need not disclose records in which the nonexempt information remaining is *meaningless*." Def.'s Mem. at 17–18 (emphasis added). Defendant's reliance on *National Security Archive v. Central Intelligence Agency* is both inapt and misleading. In that case, the court found that "non-exempt information [was] so inextricably intertwined with the exempt information that release of the non-exempt information would produce only *incomplete, fragmented, unintelligible sentences* composed of *isolated, meaningless words*." *Nat'l Sec. Archive v. Cent. Intelligence Agency*, 402 F. Supp. 2d 211, 220–21 (D.D.C. 2005) (emphasis added). But Defendant has not explained why further segregation of the White House-DOJ Communication or the Agency-DOJ Communications would result in "incomplete, fragmented, unintelligence sentences composed of isolated, meaningless words." *See* Brinkmann Decl. ¶ 32.

On the contrary, there may be quite a bit of "meaningful" information to glean from these records. For example, even if substantive content were to be withheld from email communications, the names of the participants on the email chains (or at least the DOJ officials) and the dates on which they took place would still be comprehensible and potentially useful. *See Judicial Watch, Inc. v. Dep't of the Treasury*, 796 F. Supp. 2d 13, 29–30 (D.D.C. 2011) (ordering agency to release

portions of "meeting minutes that indicate the meetings' dates and attendees).  The Court accordingly should reject Defendant's interpretation of the word "meaningful" and require the agency to conduct a supplemental segregability review.

## III.    *In camera* review of the records at issue would be appropriate.

The FOIA authorizes a district court to conduct an *in camera* inspection of an agency's withholdings to determine whether the agency has met its burden in justifying the application of any statutory exemption.   5 U.S.C. § 552(a)(4)(B).   Based on the foregoing discussion of Defendant's improper use of Exemption 5, and its questionable efforts to segregate non-exempt portions of records for release, it would be appropriate for the Court to conduct an inspection of the records at issue.  *See Loving v. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008) ("[D]istrict courts have 'broad discretion' to decide whether *in camera* review is necessary to determine whether the government has met its burden[.]" (citing *Armstrong v. Exec. Office of the President*, 97 F.3d 575, 577–78 (D.C. Cir. 1996)).

*In camera* review of Defendant's withholdings would be particularly apt because it has neither proffered satisfactory justifications for its use of the attorney-client and deliberative process privileges, nor has it identified *any* foreseeable harm to legitimate agency interests that would result from disclosure.  *See Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 997 (D.C. Cir. 1998) ("If the agency fails to provide a sufficiently detailed explanation to enable the district court to make a de novo determination of the agency's claims of exemption, the district court then has several options, including inspecting the documents *in camera*[.]"); *see also Quiñon v. Fed. Bureau of Investigation*, 86 F.3d 1222, 1229 (D.C. Cir. 1996) ("[W]here an agency's affidavits merely state in conclusory terms that documents are exempt from disclosure, an *in camera* review is necessary." (citation omitted)).

Given the modest number of pages at issue—specifically, fourteen (14) pages—*in camera* review here would not be onerous.  *See id.* at 1228 (the number of records to be inspected is "another . . . factor to be considered" when determining whether in camera review is appropriate); *Carter v. Dep't of Commerce*, 830 F.2d 388, 393 (D.C. Cir. 1987) ("[W]hen the requested documents 'are few in number and of short length,' *in camera* review may save time and money." (citation omitted)); *see also People for the Am. Way Found.*, 503 F. Supp. 2d at 307 ("*In camera* review may be appropriate when . . . 'the number of records involved is relatively small[.]" (citation omitted)).  The Court should therefore order Defendant to submit a supplement affidavit *in camera* with unredacted versions of the records at issue for the Court's consideration.

## **CONCLUSION**

For the foregoing reasons, CoA Institute respectfully requests that the Court deny Defendant's motion for summary judgment and grant CoA Institute's cross-motion for summary judgment.

Dated: May 4, 2018                              Respectfully submitted,

                                                                */s/* Ryan P. Mulvey
                                                                Ryan P. Mulvey
                                                                D.C. Bar No. 1024362
                                                                Lee A. Steven
                                                                D.C. Bar No. 468543

                                                                CAUSE OF ACTION INSTITUTE
                                                                1875 Eye Street, N.W., Suite 800
                                                                Washington, D.C. 20006
                                                                Telephone: (202) 499-4232
                                                                Facsimile: (202) 330-5842
                                                                ryan.mulvey@causeofaction.org
                                                                lee.steven@causeofaction.org

                                                                *Counsel for Plaintiff CoA Institute*

23