**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
CAUSE OF ACTION INSTITUTE              )
                                                    )
            *Plaintiff*,                                 )
                                                    )
            v.                                          )            Civil Action No. 17-01423 (JEB)
                                                    )
U.S. DEPARTMENT OF JUSTICE,          )
                                                    )
            *Defendant*.                              )
_____)

**PLAINTIFF'S REPLY IN SUPPORT OF ITS**
**CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Table of Authorities ................................................................................................................ ii

Introduction ........................................................................................................................... 1

Argument ............................................................................................................................... 2

   I.   Defendant failed to file a response to CoA Institute's Statement of Undisputed Material Facts and improperly refused to address a key material, factual allegation. ...................... 2

   II.   The attorney-client privilege does not protect the records at issue ................................... 5

      A.   The White House-DOJ Communication is not protected by attorney-client privilege. ......................................................................................................... 5

      B.   The Agency-DOJ Communications are not protected by attorney-client privilege. ......................................................................................................... 8

   III.   The deliberative process privilege does not protect the records at issue. ........................ 10

      A.   The White House-DOJ Communication is not protected by the deliberative process privilege. ............................................................................................. 10

      B.   The Agency-DOJ Communications are not protected in their entirety by the deliberative process privilege. ............................................................................ 13

   IV.   Defendant's position would render the "foreseeable harm" standard surplusage. ........... 15

   V.   Defendant's arguments concerning its segregability review are unavailing. ................... 17

   VI.   At a minimum, the Court should undertake *in camera* review of the records at issue. ..... 19

Conclusion ........................................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akin, Gump, Strauss, Hauer & Feld, LLP v. Department of Justice,*
   503 F. Supp. 2d 373 (D.D.C. 2007) .......................................................7, 9

*Ancient Coin Collectors Guild v. Department of State,*
   641 F.3d 504 (D.C. Cir. 2014) .......................................................11, 15

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986).......................................................5

*Brinton v. Department of State,*
   636 F.2d 600 (D.C. Cir. 1980) .......................................................7, 9

*Chesapeake Bay Foundation, Inc. v. U.S. Army Corps of Engineers,*
   722 F. Supp. 2d 66 (D.D.C. 2010) .......................................................13

*Citizens for Responsibility & Ethics in Washington v.*
   *National Archives & Records Administration,*
    583 F. Supp. 2d 146 (D.D.C. 2008) .......................................................5, 6

*Citizens for Responsibility & Ethics in Washington v. Department of Labor,*
   478 F. Supp. 2d 77 (D.D.C. 2007) .......................................................11

*Coastal States Gas Corp. v. Department of Energy,*
   617 F.2d 854 (D.C. Cir. 1980) .......................................................10

*Coffey v. Bureau of Land Management,*
   277 F. Supp. 3d 1 (D.D.C. 2017) .......................................................5

*Corley v. United States,*
   556 U.S. 303 (2009).......................................................15

*Finance Co. of America v. BankAmerica Corp.,*
   493 F. Supp. 895 (D. Md. 1980) .......................................................14

*Fox News Network, LLC v. Department of the Treasury,*
   911 F. Supp. 2d 261 (S.D.N.Y. 2012).......................................................14

*Gardels v. Central Intelligence Agency,*
   689 F.2d 1100 (D.C. Cir. 1982) .......................................................4

*In re Grand Jury Proceedings,*
   517 F.2d 666 (5th Cir. 1975) .......................................................18

*Ibrahim v. Department of State*,
  No. 16-01330, 2018 WL 2107780 (D.D.C. May 7, 2018)......................................................15

*Judicial Watch, Inc. v. Department of Justice*,
  365 F.3d 1108 (D.C. Cir. 2004)...........................................................................................11, 12

*Judicial Watch, Inc. v. Department of State*,
  241 F. Supp. 3d 174 (D.D.C. 2017)..........................................................................................12

*Judicial Watch, Inc. v. Department of the Treasury*,
  796 F. Supp. 2d 13 (D.D.C. 2011)..............................................................................................8

*Loving v. Department of Defense*,
  550 F.3d 32 (D.C. Cir. 2008)....................................................................................................19

*Maydak v. Department of Justice*,
  362 F. Supp. 2d 316 (D.D.C. 2005)..........................................................................................11

*Mingo Logan Coal Co. v. Environmental Protection Agency*,
  714 F.3d 608 (D.C. Cir. 2013)..................................................................................................16

*Minier v. Central Intelligence Agency*,
  88 F.3d 796 (9th Cir. 1996).........................................................................................................4

*National Day Laborer Organizing Network v.*
*U.S. Immigration & Customs Enforcement Agency*,
  811 F. Supp. 2d 713 (S.D.N.Y. 2011).......................................................................................14

*National Labor Relations Board v. Jackson Hospital Corp.*,
  257 F.R.D. 302 (D.D.C. 2009)................................................................................................7, 9

*National Security Archive v. Central Intelligence Agency*,
  402 F. Supp. 2d 211 (D.D.C. 2005)..........................................................................................19

*Prime Insurance Syndicate, Inc. v. Damaso*,
  471 F. Supp. 2d 1087 (D. Nev. 2007).......................................................................................14

*Public Citizen, Inc. v. Office of Management & Budget*,
  598 F.3d 865 (D.C. Cir. 2010)..................................................................................................11

*Quiñon v. Federal Bureau of Investigation*,
  86 F.3d 1222 (D.C. Cir. 1996)..................................................................................................20

*Ryan v. Department of Justice*,
  617 F.2d 781 (D.C. Cir. 1980)..................................................................................................12

*In re Sealed Case*,
   121 F.3d 729 (D.C. Cir. 1997) ...................................................................................12

*United States v. Legal Services for New York City*,
   100 F. Supp. 2d 42 (D.D.C. 2000) .............................................................................18

*United States v. Palmer*,
   854 F.3d 39 (D.C. Cir. 2017) .....................................................................................15

*Urban Air Initiative, Inc. v. Environmental Protection Agency*,
   271 F. Supp. 3d 241 (D.D.C. 2017) ...........................................................................14

*Winston & Strawn, LLP v. McLean*,
   843 F.3d 503 (D.C. Cir. 2016) .....................................................................................5

**Statutes**

5 U.S.C. § 552(a)(4)(B) .......................................................................................................19

5 U.S.C. § 552(b) .................................................................................................................17

**Rules**

Federal Rule of Civil Procedure 56(e) ..............................................................................3, 5

Local Civil Rule 7(h)(1) .........................................................................................................3

**Legislative Materials**

H.R. Rep. No. 114-391 (2016) ............................................................................................16

S. Rep. No. 114-4 (2016) ....................................................................................................16

**Other Authorities**

*About the Office—Office of Legislative & Intergovernmental Affairs*,
   Sec. & Exch. Comm'n, https://coainst.org/2LHr6rO ..................................................9

*About the Office*, Dep't of Justice Office of Legislative Affairs,
   http://bit.ly/2w5RAjZ....................................................................................................9

Adam M. Chud, *In Defense of the Government Attorney-Client Privilege*,
   84 Cornell L. Rev. 1682 (1999) ...................................................................................6

Cause of Action Inst., Grading the Government: How the White House Targets
   Document Requesters (2014), http://coainst.org/2aFWxUZ .....................................17

Cause of Action Inst., *Litigation Update: Ensuring Access to Records of the Executive Branch's Interaction with Congress*, Oct. 5, 2017, http://coainst.org/2gYhI67 ...........................................................................................17

Cause of Action Inst., *White House Directive on Congressional Oversight Requests Classified as "Presidential Record," Not Subject to Disclosure under the FOIA*, Mar. 22, 2018, http://coainst.org/2DMWTTV ............................17

Cause of Action Inst., *Politics Clouding Criticism of the EPA's Heightened Sensitive Review FOIA Procedures*, May 14, 2018, https://coainst.org/2l5zxlq ....................17

*Contact Us*, Fed. Hous. Fin. Agency, http://bit.ly/2Jx3tpi ...........................................................10

*External Affairs*, Consumer Fin. Prot. Bureau, http://bit.ly/2JPmL8F ............................................9

Jeremy Rabkin, *At the President's Side: The Role of the White House Counsel in Constitutional Policy*, 56-AUT Law & Contemp. Probs. 63 (1993) .........................................6

*Mission—Office of Legislative Affairs*, Dep't of the Treasury, http://bit.ly/2LO1Dxb ...........................................................................................................9

*OCC Leadership*, Office of the Comptroller of the Currency, http://bit.ly/2sVqHv5 ...........................................................................................................9

*Office of Board Members*, Board of Governors of the Fed. Reserve, http://bit.ly/2t49ChW ..........................................................................................................9

*Office of Congressional & Intergovernmental Affairs*, Export-Import Bank of the U.S., http://bit.ly/2MprPPF .............................................................9

*Office of Congressional/Intergovernmental Relations*, Dep't of Housing & Urban Dev., http://bit.ly/2y7NJUF .........................................................9

*Office of External Affairs*, Fed. Emergency Mgmt. Agency, http://bit.ly/2t3ggos......................10

*Office of Legislative Affairs*, Fed. Deposit Ins. Corp., http://bit.ly/2HLTdUl ...............................9

*Office of Public and Congressional Affairs*, Nat'l Credit Union Admin., http://bit.ly/2MqsrV4 ...........................................................................................................9

*Presidential Departments*, The White House, http://bit.ly/2MmkQad............................................6

**INTRODUCTION**

This Freedom of Information Act ("FOIA") case concerns records of communications between Defendant Department of Justice's ("DOJ") Office of Information Policy ("OIP"), or Office of Legislative Affairs ("OLA"), and twelve Executive Branch agencies, the White House, and certain members of Congress and their staffs. Those communications, in turn, concern an unprecedented directive from Representative Jeb Hensarling, Chairman of the United States House of Representatives Committee on Financial Services, to the twelve agencies under his jurisdiction to treat all records of their dealings with the Committee as not subject to disclosure under the FOIA (hereinafter referred to as the "Hensarling Directive").

In support of its cross-motion for summary judgment, Plaintiff Cause of Action Institute ("CoA Institute") explained that Defendant misapplied the attorney-client and deliberative process privileges to withhold records that (1) were not exchanged within the context of an attorney-client relationship; (2) did not reveal private confidences or the solicitation of legal advice; (3) were purely factual, informational, or otherwise non-deliberative; (4) were already publicly available; or (5) could not be exempt because the applicable privilege had been waived. For the reasons set forth below, Defendant's arguments in opposition to Plaintiff's cross-motion are unavailing.

As a preliminary matter, CoA Institute notes that Defendant failed to file a response to Plaintiff's Statement of Undisputed Material Facts and has refused to address a key factual allegation concerning the nature of a record attached to an email originating with the Office of the White House Counsel ("OWHC"), which CoA Institute claims is a copy of the Hensarling Directive. Defendant also failed to rebut CoA Institute's other arguments, relying on inapt caselaw, mischaracterizing the legal principles at issue, and asking this Court to render statutory

provisions of the FOIA surplusage.  At the least, Defendant has failed to meet its burden to demonstrate that it made reasonable efforts to segregate non-exempt material for release.

## ARGUMENT

**I.    Defendant failed to file a response to CoA Institute's Statement of Undisputed Material Facts and improperly refused to address a key material, factual allegation.**

One aspect of the parties' dispute concerns the nature of the attachment to an email from the OWHC.  *See* Decl. of Vanessa R. Brinkmann Ex. C [hereinafter Brinkmann Decl.], ECF No. 14-1.  That attachment—a two-page letter that originated with Congress and was addressed to an unidentified Executive Branch agency—was identified as responsive to CoA Institute's FOIA request but was withheld in full by OIP.  *See* Def.'s Mem. of P. & A. in Supp. of Def.'s Mot. for Summ. J. at 5, 9–11, 17 [hereinafter Def.'s Mem.], ECF No. 14; Brinkmann Decl. ¶¶ 22, 31.  Given the timing and content of the cover email to which the two-page letter was attached; the subject-matter of CoA Institute's FOIA request, which was limited to communications about the Hensarling Directive and the treatment under the FOIA of records exchanged between Executive Branch agencies and Congress, *see* Compl. Ex. 1, ECF No. 1-1; and CoA Institute's related request for a public interest fee waiver, which established its primary interest in records concerning the Hensarling Directive, *see id.* at 4 ("CoA Institute intends to educate the public about the DOJ's involvement with Chairman Hensarling's controversial FOIA directive, and the DOJ's efforts, if any, to advise other agencies as to how they should respond to that directive."), CoA Institute reasonably concluded that the attachment could only be a copy of the Hensarling Directive, and it stated as much in its statement of material facts.  *See* Pl.'s Statement of Undisputed Material Facts ¶ 24, ECF No. 15-2.  The alleged fact that the attachment to the OWHC email is a copy of the Hensarling Directive is vital to determining whether that record is privileged.  *See* Pl.'s Mem. of

P. & A. in Opp'n to Def.'s Mot. for Summ. J. & in Supp. of Pl.'s Cross-Mot. for Summ. J. at 9–10, 15–16 [hereinafter Pl.'s Cross-Mot.], ECF No. 15-1.

Defendant goes to great lengths to mischaracterize CoA Institute's position as "rank speculation." *See, e.g.*, Def.'s Reply in Supp. of its Mot. for Summ. J. & Opp'n to Pl.'s Cross-Mot. for Summ. J. at 10 [hereinafter Def.'s Reply], ECF No. 17. But Defendant does not actually deny CoA Institute's factual assertion that the attachment is the Hensarling Directive. Defendant instead refuses to confirm or deny the alleged nature of the letter. *See id.* at 1 ("OIP [has taken] the position that it [can] not identify the information withheld without revealing both the particular details under consideration, as well as the thought processes of the Executive Branch."). Defendant also has failed to respond to CoA Institute's other factual allegations in contravention of established federal practice and applicable rules. *See* Fed. R. Civ. P. 56(e) ("If a party . . . fails to properly address another party's assertion of fact . . . the court may [among other things] (1) give an opportunity to properly . . . address the fact; [or] (2) consider the fact undisputed for purposes of the motion[.]"); Local Civil Rule 7(h)(1) ("[T]he Court may assume that facts identified by the moving party in its statement of materials facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.").

Defendant argues that "it cannot confirm whether the attachment is the Hensarling letter, precisely because identifying the exact letter . . . would reveal confidential information." Def.'s Reply at 4. It is hard to countenance this claim. With respect to the deliberative process privilege, Defendant's declarant testified only that "identification of the *exact letter selected by WHCO* for agency engagement would reveal the very details of Executive Branch decision-making[.]" Brinkmann Decl. ¶ 31 (emphasis added). Admitting or denying CoA Institute's factual allegation, however, would not entail the identification of the "exact letter" selected by the White House.

3

Similarly, with respect to the attorney-client privilege, Defendant's declarant failed to explain why clarifying the general nature of the attached "FOIA letter" would reveal any client confidences. *See id.* ¶ 22; *see also* Def.'s Mem. at 17.

If Defendant were to admit that the attachment is a copy of the Hensarling Directive, it would reveal nothing privileged. Conversely, if Defendant were to deny that the attachment is the Hensarling Directive, it would only impliedly admit the existence of another congressional communication. The fact of the existence of a heretofore unknown letter cannot possibly be privileged, otherwise Defendant would not have disclosed the attachment in the first place, even (as it did) in fully redacted form. If Defendant's position were correct, it should have instead refused to acknowledge the existence of the attachment and cover email at the outset with a *Glomar* response. *See Gardels v. Cent. Intelligence Agency*, 689 F.2d 1100, 1103 (D.C. Cir. 1982) ("[A]n agency may refuse to confirm or deny the existence of records where to answer the FOIA inquiry would cause harm cognizable under an . . . exception."); *accord Minier v. Cent. Intelligence Agency*, 88 F.3d 796, 800 (9th Cir. 1996) ("[An] agency may issue a 'Glomar Response,' . . . if the FOIA exemption [at issue] would itself preclude the acknowledgment of such documents.").

Defendant provides no other authority to justify its refusal to answer CoA Institute's factual allegations or to excuse its intransigence in addressing the general nature of the "FOIA letter." Having acknowledged the existence of the attachment, Defendant must provide enough detail about it to facilitate the Court's adjudication, particularly given CoA Institute's arguments about confidentiality and public disclosure. *See* Pl.'s Cross-Mot. at 9–10, 15–16. The Court should therefore order Defendant to address CoA Institute's factual allegations or treat those facts as

conceded in CoA Institute's favor.[1]  *See* Fed. R. Civ. P. 56(e).  In the alternative, the Court should undertake *in camera* review to examine the records at issue.  *See* Pl.'s Cross-Mot. at 22–23; *see also infra* at pp. 19–20.

## II.    The attorney-client privilege does not protect the records at issue.

### A.    The White House-DOJ Communication is not protected by attorney-client privilege.

As set forth in CoA Institute's cross-motion for summary judgement, the White House-DOJ Communication at issue was not created within the context of an attorney-client relationship and is not exempt from disclosure under the attorney-client privilege.  *See* Pl.'s Cross-Mot. at 8–9.  Assuming an attorney-client relationship existed, the records would still be non-exempt because they neither share private confidences nor reflect the solicitation of legal advice.  *Id.* at 9–10.  Defendant has failed to rebut CoA Institute's arguments.

*First*, Defendant claims that CoA Institute "cites no basis or authority" for the proposition that an attorney-client relationship cannot exist between the OWHC and OIP.  Def.'s Reply at 3.  But Defendant offers no authority to prove the contrary.  Defendant instead mischaracterizes the lone case upon which it relies: *Citizens for Responsibility & Ethics in Washington v. National Archives & Records Administration*, 583 F. Supp. 2d 146 (D.D.C. 2008) [hereinafter *CREW*].  In *CREW*, the court was presented with a series of emails and a draft Memorandum of Understanding

---

[1] If the Court treats CoA Institute's factual claim about the nature of the attachment as conceded, the Court still has an independent duty to ensure that the claim is properly supported.  *Cf. Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 506–08 (D.C. Cir. 2016).  CoA Institute's claim is based on reasonable inference.  *See Coffey v. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1, 6 (D.D.C. 2017) ("Under FOIA, the underlying facts and inferences drawn from them are analyzed in the light most favorable to the FOIA requester[.]").  The Court need not make an actual factual determination; it must only decide whether a nonmovant has raised enough of a dispute to show that a finder of fact could return a determination in favor of the nonmovant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).  Defendant has not met its burden in that respect because it did not respond to CoA Institute's Statement of Undisputed Material Facts.

concerning the retention of White House visitor logs.  Those records were held to be properly privileged, but the underlying attorney-client relationship was not between the White House and the defendant agency, but between that agency and DOJ's Office of Legal Counsel ("OLC").  *Id.* at 164–65.  The involvement of an Associate Counsel to the President was limited to forwarding OLC's draft legal advice to various Executive Branch agencies.  *Id.* at 165.  Here, the relevant attorney-client relationship purportedly exists between OIP and the OWHC.  The *CREW* decision, therefore, is inapposite.

Defendant offers no other relevant evidence or authority in support of its position, except a broad assertion about the role of DOJ in rendering "'legal services essential to the operations of the Executive Branch.'"  Def.'s Reply at 3 n.1 (citation omitted).  The OWHC performs a unique role as attorney to the President in his official capacity.  *See Presidential Departments*, The White House, http://bit.ly/2MmkQad (last visited June 14, 2018) ("The [OWHC] advises the President, the Executive Office of the President, and the White House staff on legal issues pertaining to the President and the White House.").  Defendant and its components, including OIP, play no role in representing the President in a similar capacity as the OWHC does, and Defendant offers no evidence that it ever represents the OWHC as an institution.  *See generally* Adam M. Chud, *In Defense of the Government Attorney-Client Privilege*, 84 Cornell L. Rev. 1682, 1718–20 (1999); *id.* at 1720 (noting that the White House Counsel, unlike Executive Branch agency heads, is "not statutorily authorized or confirmed by the Senate, and is relatively isolated from outside inquiry"); Jeremy Rabkin, *At the President's Side: The Role of the White House Counsel in Constitutional Policy*, 56-AUT Law & Contemp. Probs. 63, 64–65 (1993) ("The White House Counsel has no statutory duties—no statute even acknowledges [its] existence . . . The White House Counsel is,

in effect, a rival source [from the Attorney General] of legal advice for the president, but one who operates in the shadows . . . literally an 'in-house counsel[.]'").

Notwithstanding Defendant's baseless claim that OIP serves as an "attorney" for the OWHC, assuming Defendant's position were taken to its logical extreme, almost all correspondence between DOJ attorneys and other officials within the Executive Branch would become subject to the attorney-client privilege whenever that correspondence pertains to a legal topic and contains non-public or confidential information. This cannot possibly be correct. *See Brinton v. Dep't of State*, 636 F.2d 600, 603 (D.C. Cir. 1980) ("[T]he attorney-client privilege applies only when information is the product of an attorney-client relationship and is maintained as confidential between attorney and client.").[2]

*Second*, Defendant insists that the White House-DOJ Communication includes "confidential agency information" but deflects the real dispute by refusing to confirm or deny if the attachment to the OWHC email is a copy of the Hensarling Directive. Def.'s Reply at 3–4. Regardless of whether the "FOIA letter" is the Hensarling Directive, it does not contain "confidential client information" belonging to the OWHC (or the White House) *qua* client. And because the OWHC does not (and cannot) represent the legal interests of any Executive Branch agencies, the OWHC's independent selection of a letter, which was provided to it by one of many agencies, cannot be understood to reflect confidential information or client confidences. *See* Pl.'s Cross-Mot. at 10 (discussing relevant caselaw).

---

[2] Defendant also has not established a "common interest" between the OWHC and OIP, such that the attorney-client privilege would apply. *See, e.g.*, *Akin, Gump, Strauss, Hauer & Feld, LLP v. Dep't of Justice*, 503 F. Supp. 2d 373, 380 (D.D.C. 2007) [hereinafter *Akin*]. Nor has Defendant attempted to establish the existence of a *de facto* attorney-client relationship. *See, e.g.*, *Nat'l Labor Relations Bd. v. Jackson Hosp. Corp.*, 257 F.R.D. 302, 311–12 (D.D.C. 2009).

In this respect, Defendant's reliance on *Judicial Watch, Inc. v. Department of the Treasury*, 796 F. Supp. 2d 13 (D.D.C. 2011), is misplaced. In that case, Treasury officials were faced with press inquiries about records submitted to the agency by a non-governmental third party. Those officials sought the advice of internal departmental counsel. *Id.* at 33. Although their "request for legal advice concerned information originating with a third party," the communications "took place in the context of an 'internal discussion related to Treasury policy,'" and so the attorney-client privilege still applied. *Id.* at 33–34. The instant case is not analogous. The OWHC does not serve as departmental counsel to any Executive Branch agency, and there is nothing in the record to suggest that an agency forwarded its copy of the "FOIA letter" to the OWHC with an expectation of privacy and to obtain legal advice (assuming the OWHC were even authorized to provide it). The White House (or OIP) cannot unilaterally transform a letter addressed to another agency by Congress into confidential client information to frustrate public disclosure.

### B.    The Agency-DOJ Communications are not protected by attorney-client privilege.

The Agency-DOJ Communications reflect correspondence between an unidentified Executive Branch agency, OLC, and OLA concerning the Hensarling Directive. Although Defendant claims the attorney-client privilege exempts these records, that cannot be the case. By sharing allegedly "confidential" materials with OLA, the attorney-client privilege was waived. *See* Pl.'s Cross-Mot. at 11–13. Defendant's arguments to the contrary are without merit.

*First*, Defendant argues that "no 'non-attorney third party' was involved in the communications . . . [because they] are between agency officials and 'senior DOJ *attorneys*.'" Def.'s Reply at 6–7. Defendant misses the point. The issue is not whether OLA attorneys were involved in the correspondence, but whether there was an attorney-client relationship between the unidentified agency and OLA. Merely communicating with a government attorney, either as a

subject-matter expert (but without the expectation of creating an attorney-client relationship) or as part of quotidian inter-governmental intercourse, does not give rise to the privilege. *See Brinton*, 636 F.2d at 603.[3]

*Second*, Defendant provides no additional evidence to establish OLA's role in providing "legal services" outside of DOJ. Defendant points to OLA's stated mission, but that is limited to providing intra-agency congressional affairs support regarding DOJ's "legislative initiatives and other interests," DOJ's "position on legislation," the "appearance of [DOJ] witnesses at congressional hearings," and "coordinat[ing] [DOJ's] responses to congressional" communications. *About the Office*, Dep't of Justice Office of Legislative Affairs, http://bit.ly/2w5RAjZ (last visited June 14, 2018). There is nothing in the record to suggest that OLA provides legal opinions to, or represents the interests of, other Executive Branch agencies. Indeed, the existence of legislative affairs offices at each of the twelve agencies that received the Hensarling Directive[4] belies Defendant's claim that "OLA's role in the provision of legal services is plain." Def.'s Reply at 7.

---

[3] As with the White House-DOJ Communication, *see supra* at note 2, Defendant has neither established any relevant common interest, *see Akin*, 503 F. Supp. 2d at 380, nor a *de facto* attorney-client relationship. *See Nat'l Labor Relations Bd.*, 257 F.R.D. at 311–312.

[4] *See Mission—Office of Legislative Affairs*, Dep't of the Treasury, http://bit.ly/2LO1Dxb (last visited June 14, 2018) (providing congressional affairs services for Treasury components, including the Financial Stability Oversight Council); *Office of Congressional/Intergovernmental Relations*, Dep't of Housing & Urban Dev., http://bit.ly/2y7NJUF (last visited June 14, 2018); *Office of Board Members*, Board of Governors of the Fed. Reserve, http://bit.ly/2t49ChW (last visited June 14, 2018); *About the Office—Office of Legislative & Intergovernmental Affairs*, Sec. & Exch. Comm'n, https://coainst.org/2LHr6rO (last visited June 14, 2018); *External Affairs*, Consumer Fin. Prot. Bureau, http://bit.ly/2JPmL8F (last visited June 14, 2018); *Office of Public and Congressional Affairs*, Nat'l Credit Union Admin., http://bit.ly/2MqsrV4 (last visited June 14, 2018); *OCC Leadership*, Office of the Comptroller of the Currency, http://bit.ly/2sVqHv5 (last visited June 14, 2018) (listing Director of Congressional Relations); *Office of Legislative Affairs*, Fed. Deposit Ins. Corp., http://bit.ly/2HLTdUl (last visited June 14, 2018); *Office of Congressional & Intergovernmental Affairs*, Export-Import Bank of the U.S., http://bit.ly/2MprPPF (last visited

*Third*, the foregoing facts also cut against Defendant's claim that OLA was involved in the Agency-DOJ Communications on a "need to know" basis.  Def.'s Reply at 7–8.  Although OLA may be a subject-matter expert on congressional issues as compared to other DOJ components, the relevant Executive Branch agencies in this case have their own competent legislative affairs experts.  And, again, the record does not show that OLA—as opposed to OLC—is "authorized" to provide legal advice to non-DOJ entities.  *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980).  *Compare* Brinkmann Decl. ¶ 15 ("The principal function of OLC is to assist the Attorney General in his role as legal adviser . . . to departments and agencies of the Executive Branch."), *with id.* ("OLA . . . [has] expertise on matters involving the Legislative Branch."), *and id.* ¶ 13 n.3.  Subject-matter expertise, by itself, can neither create an attorney-client relationship nor excuse the involvement of a third party in privileged communications.

**III.    The deliberative process privilege does not protect the records at issue.**

**A.    The White House-DOJ Communication is not protected by the deliberative process privilege.**

The White House-DOJ Communication is neither (1) predecisional nor (2) deliberative because it does not reflect a consultative process and it includes a non-deliberative record, which may already be publicly available.  *See* Pl.'s Cross-Mot. at 14–16.  Defendant's attempted rebuttal of CoA Institute's arguments is unavailing.

*First*, Defendant argues that because "the decision-making process implicated in the White House-DOJ Communication relates to the treatment of certain records under the FOIA and responses to congressional inquiries," no further specificity is required.  Def.'s Reply at 10.

---

June 14, 2018); *Office of External Affairs*, Fed. Emergency Mgmt. Agency, http://bit.ly/2t3ggos (last visited June 14, 2018); *Contact Us*, Fed. Hous. Fin. Agency, http://bit.ly/2Jx3tpi (last visited June 14, 2018) (listing contact information for Office of Congressional Affairs).

Defendant further claims that "[c]onsultative discussions about a FOIA matter related to congressional correspondence are part of a predecisional deliberative process until they result in policy or action[.]"  *Id.* at 10 n.5.  But the cases upon which Defendant relies are inapt.

Although the court in *Citizens for Responsibility & Ethics in Washington v. Department of Labor* recognized that an agency need not "indicate[] precisely what policies were under consideration," 478 F. Supp. 2d 77, 82 (D.D.C. 2007), that does not overcome CoA Institute's argument, which is that Defendant has not identified the "*agency* decision or *agency* decision-making process" implicated by the OWHC email and attachment.  Pl.'s Cross-Mot at 14.  In other words, the White House-DOJ Communication does not "reflect internal [OIP] deliberations on the advisability of any particular course of action" to be undertaken by DOJ, as opposed to the OWHC. *Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 875 (D.C. Cir. 2010); *see also Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2014) (a record is "predecisional" when generated "'[a]ntecedent to the adoption of an *agency* policy.'") (citation omitted and emphasis added).  And, unlike the Bureau of Prisons in *Maydak v. Department of Justice*, Defendant has not shown that OIP maintains a "continuing process" for "making decisions" relating to the OWHC's (or the White House's) formulation of a government-wide policy for agencies to follow when responding to congressional missives such as the Hensarling Directive.  362 F. Supp. 2d 316, 326 (D.D.C. 2005) (citation and internal brackets omitted).

Defendant also offers no authority to support the withholding of records that may reveal the internal deliberations of the OWHC or any other White House component.  This is not to say such records could never be covered by Exemption 5.  On the contrary, courts have recognized that the *presidential communications privilege* applies to "'documents or other materials that reflect presidential decision-making and deliberations[.]'"  *Judicial Watch, Inc. v. Dep't of Justice*,

365 F.3d 1108, 1113 (D.C. Cir. 2004) [hereinafter *Judicial Watch*] (citation omitted).  There is little doubt that Defendant believes the deliberative interests at issue to belong to the White House. *See* Def.'s Mem. at 10–11 ("The choice and presentation of the specific document selected for consideration and engagement, and the degree of that engagement, is . . . revelatory of the WHCO's thought processes and deliberations.") (citing Brinkmann Decl. ¶ 31).  Yet Defendant neither invoked the presidential communications privilege nor attempted to satisfy the prerequisites for its application here, such as acquiring an affidavit from a responsible OWHC attorney. *Judicial Watch*, 365 F.3d at 1114; *In re Sealed Case*, 121 F.3d 729, 744–45 & n.16 (D.C. Cir. 1997).

 *Second*, Defendant argues that CoA Institute's arguments concerning "informational notice" must fail because Defendant has not admitted that the attachment to the OWHC email is a copy of the Hensarling Directive. *See* Def.'s Reply at 10–11.  Assuming the attachment were a copy of another, unknown congressional communication—which Defendant does not actually claim—then the unredacted portions of the White House-DOJ Communication would still suggest that OWHC was simply alerting OIP to the existence of a congressional letter that had been received by multiple agencies.  The deliberative process privilege does not cover such correspondence. *Judicial Watch, Inc. v. Dep't of State*, 241 F. Supp. 3d 174, 185 (D.D.C. 2017).[5]

 *Third*, Defendant argues that the Court should reject a strict "fact/opinion test" because the deliberative process privilege protects "the deliberative process itself."  Def.'s Reply at 11–12.  But this case does not present a situation where the "fact/opinion" distinction can be easily dismissed.  *See Ryan v. Dep't of Justice*, 617 F.2d 781, 791 (D.C. Cir. 1980) (disclosure permissible unless "factual segments . . . reveal the deliberative process and are not intertwined

---

[5] Thus, contrary to Defendant's position, *see* Def.'s Reply at 11 n.6, it must still attest to the motive of OWHC staff in choosing to correspond with OIP, in the first instance, and in selecting one particular copy of the "FOIA letter" over another.  *See* Pl.'s Cross-Mot. at 16.

with the policy-making process"). To the extent the OWHC's selection of one, specifically-addressed copy of an otherwise identical letter received by various agencies implicates a deliberative process—which Defendant can only assume, *see* Brinkmann Decl. ¶ 31; *see also* Pl.'s Cross-Mot. at 16 (raising doubts over Defendant's ability to "testify as to the motive of OWHC staff in choosing one copy of the Hensarling Directive over another")—the redaction of agency-identifying information would defuse any foreseeable harm to the interests underlying Exemption 5. CoA Institute raised this point, *see* Pl.'s Cross-Mot. at 16 n.6, but Defendant failed to respond.

**B.   The Agency-DOJ Communications are not protected in their entirety by the deliberative process privilege.**

Although some of the Agency-DOJ Communications may be deliberative, various records in the collection fall outside the privilege, including certain correspondence, draft documents, and other factual information. *See* Pl.'s Cross-Mot. at 16–18. Defendant raises various responses to CoA Institute's arguments, but all of them are without merit.

*First*, Defendant argues that a mere "request for legal advice" would still be deliberative, insofar as it would "reveal deliberative information—namely the thought processes of the agency and the precise details of the parties' deliberations." Def.'s Reply at 13. But Defendant has disclosed the fact that an agency sought feedback from DOJ on how to respond to the Hensarling Directive, *see, e.g.*, Brinkmann Decl. ¶ 28, and the public is already aware of the Hensarling Directive, its controversial nature, and the varied responses that agencies have provided to the House Financial Services Committee. *See* Pl.'s Cross-Mot. at 17; *id.* at 2–4. Defendant offers no other basis to conclude that an email initiating a consultation with DOJ would reveal the "thought process" of the agency, *see Chesapeake Bay Found., Inc. v. U.S. Army Corps of Eng'rs*, 722 F. Supp. 2d 66, 75 (D.D.C. 2010) (a record is non-deliberative unless it "makes recommendations"

or "expresses opinion on legal or policy matters"), and it also does not address why such an email must be withheld in full to protect deliberative interests belonging to DOJ or another agency.

*Second*, Defendant argues that "drafts, even those including information that is later made publicly available, are typically protected to avoid public confusion." Def.'s Reply at 14. In doing so, Defendant emphasizes that the draft at issue is not necessarily a copy of the unidentified agency's response to the Financial Services Committee,[6] but "consists of a proposal by the agency with regard to the issue under consideration," namely, the Hensarling Directive. *Id.* at 15. Defendant cannot sustain its argument without further clarification.

Not all drafts are created equal; whether the draft at issue is protected as deliberative depends on several factors, including whether it relates to the formulation of a substantive policy position rather than a process of determining how best to respond to Chairman Hensarling. *See Fox News Network, LLC v. Dep't of the Treasury*, 911 F. Supp. 2d 261, 276–77, 279 (S.D.N.Y. 2012); *see also Nat'l Day Laborer Organizing Network v. U.S. Immigration & Customs Enf't Agency*, 811 F. Supp. 2d 713, 741 (S.D.N.Y. 2011) ("Deliberations about how to present an already

---

[6] Defendant makes much ado about CoA Institute having possibly gathered "agency responses" from an online source, namely, BuzzFeed. *See* Def.'s Reply at 14–15; *see also* Pl.'s Cross-Mot. at 2–3 (discussing these "agency responses"). But in light of Defendant's failure to file a response to CoA Institute's Statement of Undisputed Material Fact, *see supra* at pp. 2–5, it has not raised a valid substantive objection to the Court's consideration of these "agency responses." Defendant has thus waived any evidentiary contest. *Cf. Fin. Co. of Am. v. BankAmerica Corp.*, 493 F. Supp. 895, 900 (D. Md. 1980) ("[D]efendants have not challenged the authenticity of the documents. Rather they have attacked plaintiff's failure to comply with the methods of authentication set out in Federal Rule of Evidence 901."); *Prime Ins. Syndicate, Inc. v. Damaso*, 471 F. Supp. 2d 1087, 1093 (D. Nev. 2007) ("[T]he Court will consider [the evidence] . . . because Defendants neither challenge [their] authenticity . . . nor the facts contained therein, and because the exhibits' appearance and contents support authentication."). In any case, Defendant's reliance on *Urban Air Initiative, Inc. v. Environmental Protection Agency*, 271 F. Supp. 3d 241 (D.D.C. 2017), is misplaced because the requester in that case—as opposed to here—did not claim that records were publicly available. *Id.* at 261 ("[T]here is no indication that any of the withheld or redacted information in this case was publicly available, and plaintiffs do not argue this point.").

decided policy to the public, or documents designed to explain that policy to—or obscure it from—the public, including in draft form, are at the heart of what should be released under FOIA.").

*Third*, it bears noting that Defendant failed to respond to CoA Institute's argument about the "attachment containing the facts underlying [a] request for legal advice."  Pl.'s Cross-Mot. at 18.  There is no evidence in the record to conclude that the factual "attachment" represents an agency's "exercise of discretion and judgment calls" in compiling factual points concerning the Hensarling Directive.  *See Ancient Coin Collectors Guild*, 641 F.3d at 513.

## IV.   Defendant's position would render the "foreseeable harm" standard surplusage.

By introducing a "foreseeable harm" standard into the FOIA, Congress sought to limit the technical application of the statutory exemptions and raise the standard by which an agency evaluates its withholdings.  *See* Pl.'s Cross-Mot. at 18–19.  Although Defendant acknowledges that Congress added such language to the statute, it asks the Court to strip the "foreseeable harm" standard of any practical effect.  *See* Def.'s Reply at 16.  The Court should reject Defendant's invitation to interpret the "foreseeable harm" standard in this manner.

Traditional canons of statutory construction cut against Defendant's claim that the "foreseeable harm" standard does nothing but codify existing government-wide practice.  Indeed, "the canon against surplusage counsels courts 'to give effect, if possible, to every clause and word of a statute,' so that, 'if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'"  *Ibrahim v. Dep't of State*, No. 16-01330, 2018 WL 2107780, at *3 (D.D.C. May 7, 2018) (citation omitted); *see also Corley v. United States*, 556 U.S. 303, 314 (2009) ("[O]ne of the most basic interpretive canons" is "that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant[.]" (internal quotation marks, brackets, and citation omitted)); *United States v. Palmer*, 854 F.3d 39, 48 (D.C. Cir. 2017) ("[C]ourts are to interpret congressional statutes in a way to avoid surplusage."

(citations omitted)).  The unambiguous language of the "foreseeable harm" standard manifests Congress's intent to require something more of an agency when it defends its withholdings.  *See Mingo Logan Coal Co. v. Envtl. Prot. Agency*, 714 F.3d 608, 612–14 (D.C. Cir. 2013).

The legislative history of the FOIA Improvement Act is instructive.  Although the "foreseeable harm" standard codified the Obama Administration's "presumption of openness," *see* Pl.'s Cross-Mot. at 19, Congress explicitly sought to "[b]uild[] on the Administration's efforts," turning the "presumption" into a "permanent requirement" that would "prohibit agencies from" technical application of the FOIA exemptions.  *See* H.R. Rep. No. 114-391 at 9 (2016), *available at* http://bit.ly/2HI8EwP; *see also* Pl.'s Cross-Mot. at 19 n.7 (explaining how the Act eliminated the discretionary nature of the "presumption of openness").  Defendant's reading of the "foreseeable harm" standard would relegate Congress's efforts to superfluity.  *See* H.R. Rep. No. 114-391 at 9 ("An inquiry into whether an agency has reasonably foreseen a specific, identifiable harm . . . would require the ability to articulate both the nature of the harm and the link between the specified harm and specific information contained in the material withheld."); S. Rep. No. 114-4 at 8 (2016), *available at* http://bit.ly/2JIbV4z ("Agencies should note that mere 'speculative or abstract fears,' or fear of embarrassment, are an insufficient basis for withholding information.").

Applying the intended force of the "foreseeable harm" standard to this case, it cannot be doubted that Defendant has failed to meet its burden.  Defendant relies on abstract harms, many of which Congress hoped to eliminate as a valid basis for withholding records.  *See* S. Rep. No. 114-4 at 8 (discussing "fear of embarrassment").  For example, with respect to the attorney-client privilege, it is dubious that revealing the identity of a client agency—which is unlikely to be privileged information anyway, *see infra* at pp. 18–19—would discourage future consultations with DOJ.  And the fear of damaging a "relationship with Congress," *see* Def.'s Reply at 18, is not

16

a recognized (let alone reasonably foreseeable) "harm" under any FOIA exemption. With respect to the deliberative process privilege, Defendant can likewise point only to non-specific harms such as "chill[ing] frank discussion and collaboration" or discouraging agency (or White House) outreach to DOJ on sensitive matters. *See id.* at 18–19.

The public is routinely aware of efforts by Congress, the White House, and Executive Branch agencies to limit release of records under the FOIA or other disclosure regimes. *See, e.g.*, Compl. ¶¶ 3–4; Compl. Ex. 1 at 4 (notes 7 & 8); *see also* Cause of Action Inst., *Politics Clouding Criticism of the EPA's Heightened Sensitive Review FOIA Procedures*, May 14, 2018, https://coainst.org/2l5zxlq; Cause of Action Inst., *White House Directive on Congressional Oversight Requests Classified as "Presidential Record," Not Subject to Disclosure under the FOIA*, Mar. 22, 2018, http://coainst.org/2DMWTTV; Cause of Action Inst., *Litigation Update: Ensuring Access to Records of the Executive Branch's Interaction with Congress*, Oct. 5, 2017, http://coainst.org/2gYhI67; Cause of Action Inst., Grading the Government: How the White House Targets Document Requesters (2014), *available at* http://coainst.org/2aFWxUZ. The controversy surrounding the Hensarling Directive is hardly unique. Because public knowledge of inter-governmental deliberations on such topics has not previously chilled internal decision-making or discouraged agency consultation on "sensitive" matters, Defendant should be required to offer a more detailed justification for its withholdings tailored to the specific records and specific deliberative processes or attorney-client relationships implicated in this case.

## V.    Defendant's arguments concerning its segregability review are unavailing.

The FOIA requires that an agency undertake efforts to release "any reasonably segregable portion" of a responsive record. 5 U.S.C. § 552(b). Defendant failed to make an adequate showing that it met its burden in this respect. *See* Pl.'s Cross-Mot. at 19–22.

*First*, Defendant admits that "the identities of the twelve agencies that received the Hensarling letter" are a matter of public knowledge.  Def.'s Reply at 20.  Nevertheless, Defendant insists that the Agency-DOJ Communications must be withheld in full because the unidentified client agency fears "being singled out and publicized as having solicited DOJ advice."  *Id.* Defendant misses the point and confuses the application of the two privileges at issue.

With respect to the deliberative process privilege, which was used to redact portions of the Agency-DOJ Communications, *see* Def.'s Reply at 12, the public already knows the twelve agencies that received copies of the Hensarling Directive.  *See* Pl.'s Cross-Mot at 21.  The public also already knows that at least one agency sought DOJ advice.  *See id.*  And the public can reasonably assume that the other eleven agencies are likely to have sought DOJ advice, too.  This last point is all the truer given Defendant's insistence that agencies consult with DOJ whenever they receive letters like the Hensarling Directive.  *See* Brinkmann Decl. ¶¶ 14–15.

More importantly, with respect to the attorney-client privilege, Defendant cannot rely on an agency's desire to keep secret its identity.  "The attorney-client privilege does *not* ordinarily protect the identity of a client . . . or the general purpose of legal work performed."  *United States v. Legal Servs. for N.Y.C.*, 100 F. Supp. 2d 42, 44–45 (D.D.C. 2000).  Indeed, this information can be vital to establishing the existence of an attorney-client relationship.  Although there are "extremely narrow exceptions" to this rule, such as when disclosure may "implicate the client in criminal wrongdoing" or otherwise reveal "an 'indubitably confidential communication,'" *id.* at 45 (citation omitted); *see also In re Grand Jury Proceedings*, 517 F.2d 666, 674–75 (5th Cir. 1975) (identity of a client protected when disclosure would reveal a privileged motive in seeking legal advice), none of those exceptions apply here.  Defendant openly admits the subject matter of the Agency-DOJ Communications—the Hensarling Directive—as well as the unidentified agency's

motivation in seeking DOJ advice.  *See* Brinkmann Decl. ¶ 24.  There is no basis to treat the identity of the client agency as privileged.

*Second*, Defendant improperly attempts to shift the burden of demonstrating the reasonableness of its segregation efforts by demanding that CoA Institute explain why segregable portions of records would be "useful."  *See* Def.'s Reply at 20 ("Plaintiff does not explain how knowing the particular individual within [DOJ] offices who were involved in the communications would be of any further use to Plaintiff.").  There is no basis in the FOIA or the attendant caselaw to support this contention.  Although an agency need not release "'incomplete, fragmented, unintelligible sentences composed of isolated meaningless words,'" *Nat'l Sec. Archive v. Cent. Intelligence Agency*, 402 F. Supp. 2d 211, 220–21 (D.D.C. 2005) (citation omitted), it cannot condition the release of non-exempt portions of records on a demonstration of "utility."  Defendant thus conflates "usefulness" with "meaningfulness."  Nevertheless, the names of the government officials involved in the Agency-DOJ Communications, and the timing of their correspondence, could prove useful as background information for future targeted FOIA requests seeking records about the Hensarling Directive or other FOIA issues involving Congress and the White House.

## VI.    At a minimum, the Court should undertake *in camera* review of the records at issue.

This Court has broad discretion to conduct an *in camera* review of records at issue.  *See Loving v. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008); *see also* 5 U.S.C. § 552(a)(4)(B).  Given the deficiencies in Defendant's declaration—in particular, the conclusory bases on which it relies for its application of the attorney-client and deliberative process privileges—and considering the limited number of pages at issue, *in camera* review would likely prove to be the most economical approach to resolving the parties' dispute.  *See* Pl.'s Cross-Mot. at 22–23.

Defendant argues that it has already provided "sufficiently detailed information" with the Brinkmann Declaration and "Plaintiff has neither contradicted that information nor suggested any

bad faith on the part of the agency." Def.'s Reply at 21. That is inaccurate. Among other things, Defendant failed to file a response to CoA Institute's Statement of Undisputed Material Facts and, in doing so, refused to respond to a key allegation concerning the identity and nature of the letter attached to the White House-DOJ Communication. *See supra* at pp. 2–5.

As noted above, Defendant's refusal to admit or deny CoA Institute's factual allegation because it believes that doing so would entail disclosing privileged information is untenable. Yet, in light of that argument, *in camera* review could alternatively permit the Court to keep confidential the details of the "FOIA letter" while evaluating the merits of CoA Institute's claims. *See Quiñon v. Fed. Bureau of Investigation*, 86 F.3d 1222, 1228 (D.C. Cir. 1996) ("[W]hen the dispute turns on the contents of the withheld documents, and not the parties' interpretations of those documents, *in camera* review may be more appropriate."). *In camera* review is therefore appropriate in this instance and would allow the Court to resolve the parties' dispute in the most efficient and expeditious manner possible.

//

//

//

//

//

**CONCLUSION**

For the foregoing reasons, and those set forth in CoA Institute's memorandum of points and authorities in support of its cross-motion for summary judgment, CoA Institute respectfully requests that the Court deny Defendant's motion for summary judgment and grant CoA Institute's cross-motion for summary judgment.

Dated: June 15, 2018                                      Respectfully submitted,

                                                          */s/ Ryan P. Mulvey*
                                                          Ryan P. Mulvey
                                                          D.C. Bar No. 1024362
                                                          Lee A. Steven
                                                          D.C. Bar No. 468543

                                                          CAUSE OF ACTION INSTITUTE
                                                          1875 Eye Street, N.W., Suite 800
                                                          Washington, D.C. 20006
                                                          Telephone: (202) 499-4232
                                                          Facsimile: (202) 330-5842
                                                          ryan.mulvey@causeofaction.org
                                                          lee.steven@causeofaction.org

                                                          *Counsel for Plaintiff CoA Institute*